1  James E. Till (State Bar No. 200464)
   TILL LAW GROUP
2  120 Newport Center Drive
   Newport Beach, CA 92660
3  Telephone: (949) 524-4999
4  Email: james.till@till-lawgroup.com

5  [Proposed] Attorneys for NEX SJ LLC, and
   SC SJ HOLDINGS LLC,
6  Debtor and Debtor-in-Possession

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10                            **SAN JOSE DIVISION**

11

12  In re:                                 Case No. 24-51683-SJ

13  NEX SJ LLC,                            Chapter 11

14                    Debtor and Debtor-
15                    in-Possession.

16  In re:                                 Case No. 24-51685-SJ

17  SC SJ HOLDINGS LLC,                    Chapter 11

18                    Debtor and Debtor-   **DECLARATION OF SAM HIRBOD IN**
                      in-Possession.[1]    **SUPPORT OF CHAPTER 11 PETITION**
19                                         **AND FIRST DAY PLEADINGS**

20                                         Hearing:
21                                         Date:        To be set by Court
                                           Time:        To be set by Court
22                                         Courtroom:   10
                                                        280 S. First Street
23                                                      San Jose, CA 95113-3099

24

25

26

27  ───────────────────
28  [1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
    number, are: NEX SJ LLC (8578) and SC SJ HOLDINGS LLC (5141).

## DECLARATION OF SAM HIRBOD

I, Sam Hirbod, make this declaration (the "**First Day Declaration**") under 28 U.S.C. § 1746:

1. I am the President of Eagle Canyon Capital, LLC, which indirectly owns 100% of NEX SJ LLC (the "**NEX SJ**") and 100% of SC SJ HOLDINGS LLC ("**SC SJ**", together with NEX SJ, the "**Debtors**").

2. I am knowledgeable and familiar with the business and financial affairs of the Debtors. Except as otherwise indicated herein, the facts set forth in this First Day Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' financial advisors or representatives of the Debtors, or my opinion based upon experience, knowledge, and information (including referenced documents I have reviewed and other information provided to me) concerning the Debtors and their assets, liabilities, operations, and activities. Subject to the foregoing, if called upon to testify, I would competently testify as to the facts set forth herein.

3. I am authorized by the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.

4. I submit this First Day Declaration on behalf of the Debtors and in support of the Debtors' (a) voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on the date hereof (the "**Petition Date**") and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**")[2]. This First Day Declaration may also be cited to and relied upon by the Debtors in subsequently filed motions, applications and other pleadings.

5. The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the chapter 11 case on its business. I have reviewed the Debtors' petitions and First Day Pleadings or have otherwise had their contents explained to me, and it is my

---

[2] As set forth in the First Day Pleadings, (i) attached hereto as **Exhibit A** is the interim budget from the Petition Date through January 2025 (the "**Budget**") and (ii) attached hereto as **Exhibit B** are the Primary Loan Documents (as defined below).

belief that the relief sought therein is essential to preserve and maximize the value of the Debtors' estates.

6.      This First Day Declaration (a) describes the events leading to the Debtors' chapter 11 filings (this "**Bankruptcy Cases**") and (b) summarizes the relief requested in, and the factual bases supporting, the First Day Pleadings.

## I.      EVENTS LEADING TO PREVIOUS CHAPTER 11 FILING

7.      Pursuant to that certain Lease Agreement, dated as of November 8, 2021, between NEX SJ LLC, a Delaware limited liability company, and SC SJ Holdings, LLC, a Delaware limited liability company and affiliate of NEX SJ, NEX SJ leased an 805-room luxury hotel located at 170 South Market Street, San Jose, California, in the heart of Silicon Valley (the "**Hotel**")[3].  At least prior to the global pandemic caused by the COVID-19 virus, the Hotel was near many of the largest Fortune 100 corporations and a popular location for conferences and conventions, particularly in the technology industry.

8.      Though normally a profitable enterprise, the Hotel's business took a dramatic and sudden downturn following the spread of the global pandemic caused by the COVID-19 virus and the related travel, gathering, and other restrictions implemented to reduce the infection rate.  Conventions, conferences, business retreats, and social gatherings were not being scheduled, and travel was significantly reduced.  As a result, the Hotel's average occupancy during the pandemic was approximately 7.7%.  The Hotel's losses for 2020 exceeded $18.6 million, and losses for 2021 exceeded $18.8 million.  Accordingly, the Hotel closed its doors on March 5, 2021, and SC SJ filed for bankruptcy shortly thereafter (the "**SC SJ 2021 Case**").

9.      On August 18, 2021, the Third Amended Joint Chapter 11 Plan of Reorganization of SC SJ (and FMT SJ LLC) (the "**SC SJ Plan**") was confirmed.  The effective date of the SC SJ Plan

---

[3] Pursuant to that certain Branding and Management Agreement, dated as of November 8, 2021, as amended by that certain First Amendment to Branding and Management Agreement, dated as of 2023, in each case between NEX SJ and Signia Hotel Management, LLC and as otherwise amended or modified (the "**Management Agreement**"), the Hotel is managed by Signia Hotel Management LLC ("**Hilton**") and Hilton Domestic Operating Company Inc. is the "Operator" of Signia Hotel Management LLC.

was November 8, 2021, and, per its terms, it was substantially consummated, under sections 1101 and 1127 of the Bankruptcy Code, as of such date.

10. On September 25, 2024, SC SJ and FMT SJ LLC filed a motion for entry of a final decree and order closing their jointly administered chapter 11 cases. As of the date of this First Day Declaration, that motion is still pending.

## II. EVENTS LEADING TO NEW CHAPTER 11 FILING

11. After confirmation of the SC SJ 2021 Case, including new senior and junior loans, and with NEX SJ as the new lessee of the Hotel, NEX SJ and SC SJ (collectively, the "**SJ Entities**") resumed the Hotel renovation efforts, investing an additional approximately $54 million to upgrade the Hotel's rooms, public areas, fitness center, and pool. In addition, direct and indirect owners of the SJ Entities contributed more than $15 million to cover operational shortfalls and interest payments. Despite the ongoing financial pressure, the SJ Entities were determined to see the project through, with the belief that the completed renovations would position the Hotel to capture future demand once the travel industry rebounded.

12. However, even as the SJ Entities pushed forward, they continued to face substantial headwinds. The group business segment, which is the lifeblood of the Hotel, did not return to San Jose until the second quarter of 2023. By this time, interest rates had risen significantly, increasing the SJ Entities' debt service obligations from approximately $650,000 per month to $1.3 million per month. Recognizing the need to reduce this financial burden, the SJ Entities initiated discussions with Hilton and Debtors' lenders, including CLNC Fair Jose Finance, LLC, a Delaware limited liability company (including its assignees, "**CLNC**")[4], about "right-sizing" the asset and deleveraging the SJ

---

[4] Pursuant to that certain Amended and Restated Loan Agreement (the "**Loan Agreement**"), that certain Subordination, Non-Disturbance, and Attornment Agreement (the "**SNDA Agreement**" and, with the Loan Agreement, the "**Primary Loan Documents**"), and the other documents contemplated thereby (collectively, the "**CLNC Loan Documents**"), CLNC agreed to loan Debtors a maximum amount of $184,953,169.21 (the "**CLNC Loan**"). The current outstanding balance of the CLNC Loan is approximately $136 million. Substantially all the Debtors' outstanding funded indebtedness arises under the CLNC Loan. True and correct copies of the Primary Loan Documents are attached hereto as **Exhibit B**.

Entities' debt. After extensive negotiations, the SJ Entities made the strategic decision to market the "South Tower" for sale.

13. In March 2023, the SJ Entities reached an agreement with a developer associated with San Jose State University, and with the full support and blessing of the SJ Entities' lenders, the transaction was completed in late November 2023. This sale was intended to significantly reduce the SJ Entities' debt and stabilize the Hotel's financial position. Indeed, the South Tower proceeds were largely used to pay down CLNC's loan in an amount of approximately $73.5 million after transaction costs and four months of interest reserves that went to CLNC. Throughout the negotiation and sale process, CLNC was closely involved and offered input, which gave the SJ Entities confidence that we were aligned in our strategy to right-size the hotel.

14. However, just days before the sale was finalized, I was notified that I would be receiving a "side letter" from CLNC. Upon receiving and reviewing the letter, I was shocked to find that it contained a demand to immediately place the "North Tower" on the market following the sale of the South Tower. This demand was unreasonable and impractical. The North Tower renovations had not been completed, and market conditions at the time were not conducive to a successful sale. In fact, industry experts warned me that listing the North Tower at that moment would send a message to potential buyers that this was a distressed sale, severely diminishing our chances of attracting competitive bids.

15. Despite my efforts to communicate the risks to CLNC, it refused to reconsider its position. Rather, CLNC informed me that if the SJ Entities did not sign the side letter, CLNC would block the sale of the South Tower. Given the financial ramifications of backing out of the sale at the last minute—San Jose State University's developer had already secured bonds that would have made the SJ Entities liable for tens of millions of dollars—I was left with no choice but to sign the side letter under duress to enable us to close the sale of the South Tower, even though I made it clear that CLNC's demands were unreasonable and in bad faith.

16. The North Tower was listed with CBRE, but as predicted, we did not receive a single written bid. Nevertheless, the SJ Entities pushed forward and completed the renovations in March 2024. Once the renovation was done, we began actively seeking refinancing options. By this time,

the hotel's business was beginning to ramp up. Future bookings were gaining traction, and our occupancy rates were steadily increasing. The outlook for the hotel was becoming more positive, and we received optimistic feedback from potential lenders. However, most lenders required a 12-month track record of strong performance before they would offer competitive financing terms.

17. Despite the SJ Entities' positive momentum, CLNC remained inflexible. In early July 2024, the SJ Entities received a default notice from CLNC, stating that our failure to comply with the side letter had triggered a default, and the full balance of the loan was now due. CLNC also informed us that it had begun foreclosure proceedings. This notice came at a time when the Hotel's performance was improving, and the SJ Entities were actively working on a solution to their debt issues. At this point, Hilton purchased the SJ Entities' mezzanine loan, which stood at $30 million.

18. The SJ Entities explored bridge financing options, which typically have a two-year duration, and in late July 2024, we signed a term sheet with Sculptor Capital Management ("**Sculptor**"). However, the financing was expensive and required additional collateral beyond the Hotel. Sculptor also introduced new terms late in the process, making the deal untenable for both the SJ Entities. After spending hundreds of thousands of dollars on third-party reports and documentation for the loan, the SJ Entities ultimately had to terminate the agreement with Sculptor due to its continued demands for material deal changes.

19. The SJ Entities then made a final settlement offer to CLNC, seeking a 60-day extension to secure new financing. We explained that since completing our renovation in March, our occupancy had reached 71% for September, with projections indicating the same for October. Our future contracts were outperforming our competitors, and the hotel was on a clear path to stabilization. CLNC rejected this offer and proceeded to continue with its foreclosure auction. I strongly believe that CLNC aims to take ownership of the asset and benefit from the dollars the SJ Entities invested now that the most challenging times are behind us. Indeed, CLNC has enjoyed healthy returns on this asset since SC SJ purchased it, while the owners of the SJ Entities have not taken a single profit distribution since acquisition.[5]

_____

[5] Indeed, CLNC has earned more than $36 million in fees and interest on its new loan over the last two years and approximately $60 million in fees and interest between the old and new loans, notwithstanding an approximately $66 million principal paydown. Conversely, I used approximately

20.     As further evidence of the positive result from the SJ Entities' extensive efforts described herein, I recently received an appraisal from HVS Consulting & Valuation, which provides, among other values, an "As Is" value of $217,400,000 for the Hotel as of October 16, 2024 (the "**Appraisal**").  A true and correct copy of the Appraisal is attached hereto as **Exhibit C**.  The Appraisal demonstrates that CLNC is more than adequately protected by the value of the Hotel.

21.     With the hotel's performance steadily improving and the refinancing market showing promise, I believe the foreclosure process is unnecessary, unjust, and opportunistic.  Therefore, the Debtors are filing for chapter 11 protection to safeguard the future of the Hotel, preserve jobs, maximize the value of the SJ Entities' estates for the benefit of <u>all</u> creditors, including equity, and continue our commitment to the City of San Jose.  Our goal is to work with our stakeholders to restructure the debt and secure the necessary financing to stabilize the asset (i.e., the Hotel) and ensure its long-term success.

22.     Finally, I cannot stress how important the Hotel's employees are to our continued success.  With that goal in mind, and notwithstanding the bankruptcy filings, I intend for the Hotel to keep all employees with their respective existing tenure and status, including honoring any agreement(s) in place with the Hotel's unions.  Our employees are the key to our continued success.

## III.    FIRST DAY PLEADINGS

23.     To enable the Debtors to minimize the adverse effects of the commencement of these Bankruptcy Cases, Debtors have requested various types of relief in the First Day Pleadings filed concurrently with this First Day Declaration.  A summary of the relief sought in each First Day Pleading, as well as the factual basis for each First Day Pleading, is set forth below.

     a.    <u>**Joint Administration Motion**</u>

          i.  By the Motion of Debtors for Entry of an Order Authorizing Joint Administration of the Chapter 11 Cases (the "**Joint Administration Motion**"), the Debtors request entry of an order directing the joint

---

$90 million to purchase the Hotel, put another $75 million into the Hotel for extensive renovations, and have not taken any distributions.

administration of the Bankruptcy Cases and the consolidation thereof for procedural purposes only and granting certain related relief.

ii. As described above, the Debtors are affiliated with each other.

iii. I understand that the joint administration of the Bankruptcy Cases will have several benefits, including (a) permitting the Clerk of the Court to utilize a single general docket for these Bankruptcy Cases and combine notices to creditors of the Debtors' respective estates and other parties in interest; (b) avoiding the need for duplicative notices, motions and applications, thereby saving the Debtors' estates time and expense; (c) enabling parties in interest to have a single point of reference for all matters relevant to these Bankruptcy Cases; (d) significantly reducing the volume of pleadings that otherwise would be filed with the Clerk of this Court; (e) rendering the completion of various administrative tasks less costly; and (f) minimizing the number of unnecessary delays associated with the administration of separate Bankruptcy Cases.

b. **Cash Collateral Motion**

i. By the *Emergency Motion for (1) Authority to Use Cash Collateral on an Interim Basis, (2) Granting Adequate Protection, (3) Scheduling a Final Hearing, and (4) Related Relief* (the "**Cash Collateral Motion**"), the Debtors seek entry of an interim order, among other things (and with capitalized terms not defined herein having the meanings set forth in said motion), (i) authorizing the use of all Cash Collateral that is subject to a lien in favor of CLNC or any Junior Secured Creditor, on an interim basis and on the terms set forth in the Cash Collateral Motion, (ii) granting CLNC, as adequate protection for such usage, a replacement lien, a super-priority claim pursuant to 11 U.S.C. §§ 503(b), 507(a)(2) and 507(b) with respect to any diminution in the value of CLNC's collateral pursuant to the CLNC Loan over the life of the Bankruptcy Cases, monthly payments of the

"Adequate Protection Payment Amount", certain statements and reports, and, to the extent that the Court determines CLNC is oversecured, accrual of interest on the CLNC Loan, (iii) granting each Junior Secured Creditor, as adequate protection for the foregoing usage, a replacement lien, monthly payments, and certain statements and reports, (iv) waiving the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rules 6004(h), and (v) granting related relief.

    ii. **CLNC Loan**

        1. On or about November 8, 2021, CLNC and the Debtors entered into, *inter alia*, the Loan Agreement and the SDNA Agreement (both as defined above).

        2. Pursuant to Section 10 of the SNDA Agreement, the Debtors, CLNC, Hilton, and the other parties thereto "agree… that, regardless of the occurrence of [any default by the Debtors or any other "Borrower Party" under the CLNC Loan Documents], "cash trap event" or other triggering event under the CLNC Loan Documents, Manager and its designees shall: … have the right to draw from the Hotel Accounts funds necessary to pay all Management Fees [as defined in the Management Agreement] (and all other charges, reimbursable expenses or costs, or amounts payable to Manager pursuant to the Management Agreement) as and when due under the Management Agreement together with all other operating expenses to operate the Hotel to the extent incurred pursuant to the Management Agreement; and (c) have the right to draw from the FF&E Account in the ordinary course in accordance with the Management Agreement." Accordingly, the Debtors believe CLNC has consented to the use of Cash Collateral as described in the motion.

3. CLNC's claim of approximately $136,000,000 under the CLNC Loan is secured by property (the Hotel) with an estimated value of approximately $217,400,000.

### iii. The Debtors' Need for Cash Collateral

1. The Debtors believe that they, including through Hilton as their agent, require the immediate use of cash on hand and other income generated from their commercial activities in order to maintain the day-to-day business operations and pay service providers and vendors on a timely basis pending confirmation of a plan. Absent such relief from the Court, the Debtors do not believe they will have sufficient liquidity to ensure uninterrupted business operations and will suffer a substantial loss of asset value to the detriment of all parties in interest.

2. Moreover, the Debtors believe that it is necessary that they be able to demonstrate to service providers, vendors, and customers that the Hotel will continue to function without interruption and that the Debtors will continue to pay vendors and others in the ordinary course of business. The Debtors believe that, absent such a showing—and in the event of any interruption or delay in the business—the Hotel's customers will likely move their business to competitors, and service providers will likely pursue opportunities with competitors, which would cripple the Debtors' business.

3. The Debtors believe that the interests of the Secured Creditors (as defined in the motion) will be protected and enhanced by the Debtors' use of cash collateral because such relief will ensure the uninterrupted operation of the Debtors' business and operations that secure the Secured Creditors' claims, thus protecting the Debtors' revenue streams and protecting the going concern value of the

Debtors. The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient liquidity is vital to their ability to maintain operations. The Debtors believe that, if the Debtors are unable to obtain approval for the use of cash collateral for such purposes, the recoveries to all creditors, including the Secured Creditors, would be greatly reduced because the value of the Debtors' estates would decline dramatically. The Debtors believe that the relief requested in the motion is therefore (i) critical to their ability to reorganize pursuant to the Bankruptcy Code, (ii) in the best interests of the Debtors and their estates and (iii) necessary to avoid irreparable harm to the Debtors, their creditors, and their assets, business, goodwill, and reputation.

c. **Cash Management Motion**

i. By the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor, Through Hilton, to (A) Operate its Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Maintain Existing Customer Programs and Honor Certain Prepetition Customer Obligations, and (II) Granting Related Relief* (the "**Cash Management Motion**"), NEX seeks entry of interim and final orders authorizing NEX, through Hilton as debtor's agent, to (a) continue operating its existing cash management system (the "**Cash Management System**"), as described in the motion; (b) honor its prepetition obligations related thereto; (c) authorizing the maintenance of existing bank accounts, including the authority to pay routine prepetition banking fees owed to financial institutions; (d) maintain existing business forms, checks, and other documents related to its bank accounts; (e) granting a limited waiver of the deposit and investment requirements imposed by section 345(b) of the Bankruptcy Code; (f) maintain existing

customer programs; and (g) honor certain prepetition customer obligations; and (h) granting related relief.

ii. As set forth above, the Hotel is managed by Hilton, including with regards to the matters set forth in the Cash Management Motion, pursuant to the terms of the Management Agreement. However, out of an abundance of caution, NEX and other parties in interest desire the relief set forth in the Cash Management Motion.

iii. Cash Management System

1. The Hotel is managed by Hilton pursuant to the terms of the Management Agreement. In the ordinary course of business, NEX, through Hilton as its agent, maintains a simple, integrated, cash management system (the Cash Management System, as set forth above) to collect, transfer, and disburse funds generated from its operations and to facilitate cash monitoring, forecasting, and reporting.

2. The Cash Management System is composed of three NEX-owned accounts that are controlled by Hilton as agent for NEX (the "**Bank Accounts**"). One is a depository account at Bank of America (xxx3602) titled in the name "SIGNIA HOTEL MANAGEMENT LLC AAF SIGNIA BY HILTON" (the "**Depository Account**").

3. Another is a disbursement account at Wells Fargo (xxx7867) titled in the name "NEX SJ LLC" (the "**Disbursement Account**").

4. The other is a reserve account for replacements and repairs at Bank of America (xxx3607) titled in the name "SIGNIA HOTEL MANAGEMENT LLC AAF SIGNIA BY HILTON" (the "**Replacement/Repair Account**").

5. The Bank Accounts are used for payment intake, wire transfers, ACH payments, and to book payments to vendors and suppliers. The

Bank Accounts are also used to fund payroll and expenses. For NEX's operating expenses, Hilton, as NEX's agent, either funds amounts via wire transfer or ACH payments directly from the Depository Account or the Replacement/Repair Account, as applicable, or, in order to issue checks, transfers money from the such account to the Disbursement Account and then issues checks drawn on the Disbursement Account. For NEX's payroll expenses, Hilton makes payments to the employees directly out of its own corporate funds and gets reimbursed from the Depository Account.

6. Each of the banks for the Bank Accounts (collectively, the "**Cash Management Banks**") is designated as an "Authorized Depository" by the United States Trustee.

7. In the ordinary course of business, NEX incurs periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "**Bank Fees**"). Historically, the Bank Fees have been de minimis and have been directly debited from the Bank Accounts. As of the Petition Date, NEX is not aware of any amounts owed on account of unpaid Bank Fees.

8. A minimal number of transactions, if any, are expected to occur outside the ordinary course of business after the Petition Date.

9. The Debtor has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

10. Considering the simplicity of NEX's Cash Management System and the speed at which transactions are effectuated, the Debtor expects that enforcement of the applicable provisions of the United States Trustee Chapter 11 Operating and Reporting Guidelines for Debtors in Possession promulgated by the U.S. Department of Justice, Office

of the United States Trustee, United States Trustee for Region 17, Northern and Eastern Districts of California and Nevada (the "**U.S. Trustee Guidelines**") during the Bankruptcy Cases may disrupt NEX's ability to efficiently administer its Bankruptcy Case.

11. Further, NEX believes that maintaining the Cash Management System (including the Bank Accounts and transactions via debit, wire, ACH transfers and other similar methods) allows efficient utilization of NEX's cash resources, will enable the Hotel to continue operating without disruption, and will facilitate the Debtor's transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and by minimizing delays in the payment of postpetition obligations. NEX also believes that certain payments to the Cash Management Banks, such as the payment of prepetition Bank Fees, will ensure the continued support of the Debtor's Cash Management Banks on a go-forward basis at this critical juncture of the Bankruptcy Case.

iv. Business Forms

1. NEX uses various pre-printed business forms, including, without limitation, letterhead, other correspondence, and checks (all such business forms, the "**Business Forms**") in the ordinary course.

2. NEX believes that using entirely new Business Forms would cause NEX to incur additional expense and delay while parties in interest will not be prejudiced if it is authorized to continue to use the Business Forms substantially in the forms existing immediately before the Petition Date because NEX intends to pay all claims in full.

v. Customer Programs and Obligations

1. NEX's customers are, essentially, its business. NEX operates in a

highly competitive service industry and in a highly competitive regional market. Accordingly, customer satisfaction and loyalty are key to its survival. In the ordinary course of business, NEX offers various programs and engages in certain practices (collectively, the "**Customer Programs**") to develop and sustain a positive reputation and engender customer loyalty, principally by and through the Hilton brand via the Hilton Honors program.

2. The Customer Programs are built into NEX's current business operations, and allow customers enrolled in such programs to take advantage of the same in a simple, integrated experience. Customers primarily interact with the Customer Programs by using "points" to book at the Hotel.

3. The Hotel is situated near many of its competitors, and this competition makes retaining loyal customers and attracting new customers critically important, especially as travel continues to return to normal and hotels take advantage of the increased demand therefor. Thus, it is essential that NEX maintain its current customers through the pendency of the Bankruptcy Cases and position itself to attract new customers. The Customer Programs are integral to this goal.

4. Moreover, the Customer Programs are built into the ordinary course operations of the Hotel and disruption thereof could result in disruption to the Hotel's operations and undermine NEX's efforts to effectively reorganize its affairs.

5. Additionally, in the ordinary course, NEX receives customer reservations and group business. Customers often book reservations online well in advance of their actual stay at the Hotel. Customers also make deposits for certain events at the Hotel.

6. In NEX's business judgment, (i) continuing the Customer Programs throughout NEX's Bankruptcy Case is essential to (a) preserve customer relationships and goodwill for the benefit of NEX's estate and (b) maximize the revenue and the value of NEX's estate for the benefit of all stakeholders and the Debtors, (ii) a cessation of the Customer Programs could irreparably damage NEX's businesses and reputation, and (iii) the benefit from maintaining these programs and honoring these obligations far exceeds the cost associated with not honoring and continuing such practices.

vi. Accordingly, the relief requested in the Cash Management Motion is essential to the operations of NEX and the Hotel.

d. **Insurance Motion**

i. By the *Debtors' Motion for Interim and Final Orders Authorizing the Debtor, through Hilton, to (I) Continue Existing Insurance Coverage and Satisfy Obligations Related Thereto in the Ordinary Court of Business; and (II) Renew, Amend, Supplement, Extend or Purchase Insurance Policies* (the "**Insurance Motion**"), the Debtors seek entry of interim and final orders authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto; and (ii) renew, amend, supplement, extend, or purchase insurance policies as may be required during these Bankruptcy Cases.

ii. As set forth above, the Hotel is managed by Hilton, including with regards to the matters set forth in the Insurance Motion, pursuant to the terms of the Management Agreement. Further, the Debtors believe that payments of their insurance obligations are transactions in the ordinary course of business. However, out of an abundance of caution, Debtors and other parties in interest desire the relief set forth in said motion.

iii. **The Insurance Policies and Related Payment Obligations**

1. In the ordinary course of business, the Debtors maintain approximately eight insurance policies that are administered by various third party carriers (the "**Insurance Carriers**").[6] These policies provide coverage for, among other things, workers' compensation, crime, employment practices liability, general liability, automobile liability, excess liability, cyber liability, and commercial property (collectively, the "**Insurance Policies**").[7] As of the Petition Date, the Debtors believe that they are current under any Insurance Policies that have been financed or the premiums for which are payable in installments and that there are no prepetition amounts due and owing with respect to the Insurance Policies.

2. The Debtors believe that continuation of the Debtors' Insurance Policies, and entry into new insurance policies as may be required during these Bankruptcy Cases, is essential to the preservation of the value of the Debtors' business and operations. Moreover, the Debtors believe that, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the U.S. Trustee requirement that a debtor maintain adequate coverage during its chapter 11 case.

3. Finally, the Debtors believe that their ability to maintain the Insurance Policies and pay any Insurance Obligations in the ordinary course of business, consistent with past practice, will provide certainty to not only the Debtors, but also the Hotel's customers, the Insurance Carriers, the Insurance Broker (as defined

---

[6] Hilton procures seven such insurance policies and allocates costs of six of those to Debtors. Debtors separately procure another such insurance policy.

[7] Certain of the Insurance Policies may cover certain non-Debtor affiliates in addition to the Debtors.

below) and other parties in interest that the Debtors have the ability to maintain appropriate insurance during this Bankruptcy Cases.

    iv. **The Insurance Broker**

        1. In the ordinary course of business, each of the Debtors and Hilton may use an insurance broker (collectively, the "**Insurance Broker**") to obtain the applicable Insurance Policies. In exchange for fees (the "**Brokerage Fees**"), the Insurance Broker primarily assists the Debtors or Hilton, as applicable, with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates. To the best of the Debtors' knowledge, Debtors do not owe any prepetition Brokerage Fees, to or through Hilton as Debtors' agent or otherwise. The Debtors believe that the use of the Insurance Broker allows the Debtors to obtain and manage their program of Insurance Policies in a reasonable and prudent manner and to realize considerable savings in the procurement of the Insurance Policies by having access to market comparables provided by the Insurance Broker.

  e. **Utilities Motion**

    i. By *Debtors' Motion for Entry of Interim and Final Orders under 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 (i) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (ii) Approving Deposit as Adequate Assurance of Payment, and (iii) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment* (the "**Utilities Motion**"), Debtors seek entry of interim and final orders (i) prohibiting the utility providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors because of the commencement of the

18

Bankruptcy Cases or for a debt that is owed by the Debtors for utility services rendered prior to the Petition Date, (ii) approving the Debtors' proposed form of adequate assurance of payment for postpetition utility services, and (iii) establishing procedures for providing adequate assurance and resolving objections of utility providers relating to the adequacy of the proposed adequate assurance.

ii. As set forth above, the Hotel is managed by Hilton, including with regards to the matters set forth in the Utilities Motion, pursuant to the terms of the Management Agreement. However, out of an abundance of caution, Debtors and other parties in interest desire the relief set forth in said motion.

iii. The Debtors' utility service providers (the "**Utility Companies**") primarily service the Hotel, including with electricity, water, natural gas, waste removal, telephone, internet, telecommunication and similar utility products and services (collectively, the "**Utility Services**"). Based on the timing of the filings in relation to the Utility Companies' billing cycles, there may be prepetition utility costs that have been invoiced to the Debtors for which payment is not yet due and prepetition utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtors.

iv. The Debtors believe that uninterrupted Utility Services are essential because the Hotel needs utility services for safety and sanitation for its customers and employees and to preserve its value as a going concern. Interruption to the Utility Services could also damage the Hotel's structure and landscaping.

v. The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, the Debtors propose an "Adequate Assurance Deposit" to provide additional assurance of payment for future services to the Utility Companies. The "Adequate Assurance

Deposit" of $175,000 is approximately fifty percent of the estimated four week cost of the Utility Services based on historical averages over the preceding twelve months. The Debtors believe that the Adequate Assurance Deposit, together with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes adequate assurance of future payment to the Utility Companies, and that the Additional Adequate Assurance Procedures are appropriate in the event that any Utility Company requests additional adequate assurance of payment pursuant to Bankruptcy Code Section 366(c)(2).

 f. **Schedules of Assets and Liabilities and Statements of Financial Affairs Motion**

  i. By the *Debtors' Motion for Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs*, the Debtors seek entry of an order granting the Debtors a thirty (30) day extension of time to file the schedules, statements, and other documents required by Bankruptcy Rule 1007(b)(1).

  ii. The Debtors are working diligently to assemble the information needed to complete the schedules, statements, and other documents required by Bankruptcy Rule 1007(b)(1) (collectively, the "**Schedules**"). However, the Debtors believe that the considerable amount of information necessary to provide a complete perspective of their financial situation requires significant effort and more time than is provided by Bankruptcy Rule 1007(c). The Debtors and their professionals have been, and continue to be, focused on preserving the Hotel's operations and restructuring the Debtors as a going concern to maximize value, maintain standards of customer satisfaction, and preserve jobs. The Debtors believe that devoting additional time to the preparation and filing of the Schedules by the statutory fourteen (14) day deadline will be an unnecessary distraction, that the requested

extension of time will allow the Debtors to file complete and accurate Schedules, and that the requested extension will not prejudice any party in interest.

    g. **Motion for Expedited Hearings**

       i. By the Debtors' Motion Pursuant to Bankruptcy Local Rule 9006-1 Requesting an Order Shortening Time for Hearings on First Day Pleadings (the "**Motion for Expedited Hearings**"), the Debtors seek entry of an order shortening time and setting the First Day Pleadings for the date and time proposed in said motion.

      ii. The Debtors believe that ample cause exists to set the First Day Pleadings for hearing as soon as practicable after the Petition Date because of the nature of the Debtors' operations as a hotel.

24. I have reviewed each of these First Day Pleadings (including the exhibits and schedules). The facts stated in the First Day Pleadings are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Pleadings is essential to protect and maximize the value of the Debtors' estates.

I declare that the foregoing is true and correct under penalty of perjury of the laws of the United States of America. Executed this 7th day of November 2024, at Coral Gables, Florida.

/s/ Sam Hirbod
Sam Hirbod